JOHNNY HASKINS,

        Plaintiff,

   v.

DANIEL SUMULONG, et al.,

        Defendants.

No. 13 CV 8392

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Johnny Haskins, a former prisoner, brought this action pursuant to 42 U.S.C. § 1983, alleging that four nurses were deliberately indifferent to his medical needs after another inmate attacked him on January 24, 2012, while he was detained at Kane County Jail. Defendants move for summary judgment. For the reasons set forth below, the motion is granted.

## I. Northern District Of Illinois Local Rule 56.1

Local Rule 56.1 sets out a procedure for presenting facts pertinent to a party's request for summary judgment pursuant to Fed. R. Civ. P. 56. Specifically, Local Rule 56.1(a)(3) requires the moving party to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). Each paragraph of the movant's statement of facts must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." LR 56.1(a). The opposing party

must file a response to each numbered paragraph in the moving party's statement, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." LR 56.1(b)(3)(C). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(b)(3)(C).

Because Haskins is proceeding pro se, defendants served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. 62.) The notice explained how to respond to defendants' summary judgment motion and Rule 56.1 Statement and cautioned Haskins that the Court would deem defendants' factual contentions admitted if he failed to follow the procedures of the local rule. (*Id*. at 1–3.)

Haskins, by the deadline ordered for a response to defendants' motion, submitted a "motion for summary judgment," which the Court construes as his response to defendants' motion. (Dkt. 92.) Haskins argues that he has sufficiently shown that defendants discriminated against him and failed to properly treat his medical needs. (Dkt. 92.) Haskins's response does not, however, detail the underlying facts, and he did not include a statement of uncontested facts or any supporting

2

evidence. He also did not respond to defendants' Rule 56.1 Statement or submit a statement of additional uncontested facts. Defendants did not submit a reply.

"[A] district court is entitled to decide [a summary judgment] motion based on the factual record outlined in the [Local Rule 56.1] statements." *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004) (third alteration in original) (internal quotation marks omitted); *see also Olivet Baptist Church v. Church Mut. Ins. Co.*, — Fed. Appx. —, 2017 WL 129943 (7th Cir. Jan. 13, 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation.") (citations omitted). Haskins's status as a pro se litigant does not excuse him from complying with Local Rule 56.1. *See Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 Fed. Appx. 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").

Accordingly, the Court will accept as true the facts set forth in defendants' Local Rule 56.1(a)(3) statement, except insofar as the statement does not accurately reflect the cited material, viewing the facts and drawing inferences in the light most favorable to Haskins. *See* N.D. Ill. L.R. 56.1(b)(3)(C); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009); *Cady*,

467 F.3d at 1061; *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

Haskins's "failure to comply with Local Rule 56.1 . . . does not . . . automatically result

in judgment for the movant. The ultimate burden of persuasion remains with [the

movant] to show that [the movant] is entitled to judgment as a matter of law."

*Raymond*, 442 F.3d at 608 (citations omitted).

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The Court's role is "to determine whether there is

a genuine issue for trial," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations and

quotations marks omitted), without "weigh[ing] evidence, mak[ing] credibility

determinations, resolv[ing] factual disputes and swearing contests, or decid[ing] which

inferences to draw from the facts." *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir.

2014).

After a properly supported motion for summary judgment is made, the party

opposing summary judgment "must set forth specific facts showing that there is a

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Although a court considers facts and reasonable inferences in the light most favorable

to the non-moving party, *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649 (7th

Cir. 2014), the non-movant must show more than disputed facts to defeat summary

judgment—disputed facts must be both genuine and material. *Scott v. Harris*, 550 U.S.

372, 380 (2007). Moreover, evidence submitted in opposition to summary judgment must be admissible at trial under the Federal Rules of Evidence, although testimony found in depositions or affidavits may be considered. *Scott v. Edinburg*, 346 F.3d 752, 759–60 & n.7 (7th Cir. 2003); Fed. R. Civ. P. 56(c).

## III.  Facts

The four defendants were employed at the Kane County Jail as nurses: Kathleen Sanchez was a Certified Nursing Assistant; Louise Peach was a Registered Nurse; Daniel Sumulong was a Registered Nurse; and Laurel Makula was a Registered Nurse who generally performed administrative and non-clinical duties, providing only occasional as-needed medical care to inmates. (DSOF ¶¶ 2–5.) Haskins was detained at the jail facing criminal charges. (DSOF ¶ 9.)

On January 24, 2012, as Haskins was eating in his cell, his cellmate sucker-punched him on the right rear side of his head, knocking Haskins to the floor on his right side. (DSOF ¶ 9, Ex. A, at 42:20–24.) Haskins remained conscious as correctional officers arrived; the officers removed the cellmate, seated Haskins, and called for medical attention. (DSOF ¶ 9.) The jail physician, Dr. Kul Sood, was not on-site, but was available by phone. (DSOF ¶ 17.) The only on-site medical personnel were nurses, who arrived shortly after the incident. (DSOF ¶¶ 10, 16, Ex. G.)

Nurse Sanchez recalls responding to treat Haskins, along with Nurses Peach and Sumulong. (DSOF ¶ 11.) Haskins did not appear disoriented or unbalanced upon her arrival. (DSOF ¶ 11.) Nurse Sanchez in her written notes documented bleeding

from a one-inch long, curved, one millimeter deep laceration on the right side of Haskins's head. (DSOF ¶ 13.) Nurse Sumulong cleaned the area, applied triple antibiotic ointment, and covered it with "4x4's" (a type of medical gauze used to stop bleeding), and Nurse Sanchez administered a tetanus shot to prevent a potential infection. (DSOF ¶¶ 13, 15.) Nurse Sanchez does not recall whether Nurse Peach or Nurse Makula participated in treating Haskins, and neither remembers the incident, although it would not have been Nurse Makula's "custom and practice as an administrative assistant . . . to respond[] to or provide[] medical treatment." (DSOF Ex. C ¶ 3; Ex. D ¶ 3; Ex. E ¶ 3.) Haskins testified that all four were present. (DSOF Ex. A, at 157:17–158:6.) At 1:30 p.m., about an hour after Haskins was treated, Nurse Sanchez spoke to Dr. Sood, who ordered an antibiotic for Haskins, "Doxycycline 100 mg PO BID x 7 days." (DSOF ¶¶ 14–15.) Nurse Sanchez also "[p]ut [Haskins] on the MD list." (DSOF Ex. H, at 12.)

Haskins, through his deposition testimony, generally agrees with Nurse Sanchez's written summary of his medical treatment immediately following his injury, with a few exceptions. He was not sure of the depth of the cut but estimated that it was about "one inch or one inch and a half" long. (DSOF ¶ 15, Ex. A. at 72:10–15.) Haskins recalls being "in a daze." (DSOF Ex. A, at 42:1.) He also remembers one female nurse saying "you need stitches," to which another female nurse responded, "I don't really feel like shaving too much hair." (DSOF Ex. A at 41:16–42:7; 42:16–24; 78:11–13.) While being treated, Haskins told the attendants that he was "in a lot of

pain," and "hurting in [his] chest"; he testified that the pain was "in his rib cage at the top," due to falling on that side after being punched. (*Id.* at 42:17–18.) He insists that, although the nurses "did certain things," they did only "what they wanted to do," rather than "what was best to do." (DSOF ¶ 16; DSOF Ex. A., Dkt. 61-1, at 146:3–16.) Haskins thought that what would be best would be to stich his head, get an x-ray, and check for internal bleeding. (DSOF ¶ 16, Ex. A, at 146:13–16.) Haskins was dissatisfied with the nurses' treatment of his cut because he wanted to wash his hair, "keep [his] hygiene up," and believed that stitches would have permitted him to do so. (DSOF Ex. A, at 43:7–16.) He also believes he was not "treated properly in a timely fashion." (*Id.* at 146:3–6.)

Per Nurse Sanchez's referral, Haskins saw Dr. Sood on Friday morning, January 27, 2012. (DSOF ¶ 18, Ex. H at 6, 11.)[1] Dr. Sood documented the area of the cut as containing a "scab & dry blood," with accompanying right-side "parietal pain," and tenderness to Plaintiff's chest related to a "contusional injury." (DSOF, Ex. H, at 11.) Haskins insists that Dr. Sood also told him that he had a concussion and refused Haskins's request for further diagnostic evaluation of that condition, but the medical record is devoid of any such diagnosis or refusal. (DSOF ¶ 50.) Dr. Sood prescribed Naprosyn 500 mg, twice per day for seven days to relieve any pain, and a topical antibiotic ointment twice a day for five days. (DSOF ¶ 18; DSOF, Ex. H, at 11.) Haskins testified that the pain medication eased but did not entirely alleviate his

---

[1] Defendants' statement of fact incorrectly lists the date as January 28. (DSOF ¶ 18.) That was not a Friday, and the supporting medical records are dated January 27, 2012. (DSOF, Ex. H. at 6, 11.)

pain, and he later requested more medication or a higher dose to avoid having to take pills so frequently. (DSOF ¶ 18.)

On February 10, 2012, Nurse Peach examined Haskins, who complained of a headache and right side pain stemming from the attack. (DSOF ¶ 22.) She found his pupils to be "equal and reactive" and referred him to Dr. Sood, who saw him on Sunday, February 12. (DSOF ¶¶ 22, 24.) Dr. Sood observed no swelling or bruising but prescribed Naprosyn twice a day for seven days and a follow-up appointment in seven days. (DSOF ¶ 25.) At the follow-up appointment on February 19, 2012, Haskins complained that he had not received pain medication in the days immediately following his injuries but reported that his pain was resolving. (DSOF ¶ 27.) Dr. Sood continued the medication plan. (DSOF ¶ 27.)

At his request through the jail's medical request kiosk, Haskins on four occasions in the month following the incident met with a social worker: on January 30, 2012, February 6, 2012, and February 11, 2012, regarding heightened stress following his former cellmate's attack; and on February 1, 2012, due to his anger at having to move to a different living unit. (DSOF ¶¶ 19, 20, 21, 24.) At these visits, the social worker variously advised him of techniques for handling anxiety, counseled him on the grievance process, and provided him with writing materials. (DSOF ¶¶ 19, 20, 21, 24.)

About one month after the incident, Haskins returned to his usual practice of religious fasting for 72 hours, once a month. (DSOF ¶ 29.) Haskins acknowledges that he has been told that the fasting can cause headaches; the practice also may lead to

confusion or light-headedness. (DSOF ¶ 51.) He continued to meet frequently with social workers. On February 28, 2012, he met with a social worker after he refused his food trays that day. (DSOF ¶ 29.) He sought an appointment on March 1, but the issue resolved itself prior to a meeting. (DSOF 30.) On March 7, April 2, and April 11, he spoke with a social worker about his anxiety regarding then-pending criminal charges and to request contact information for a legal organization. (DSOF ¶ 30.) On June 4, he separately saw a social worker and Nurse Sumulong "per mental health due [sic] fasting"; Nurse Sumulong noted that Haskins would "probably start eating again tomorrow" and that the "plan [was] to continue to monitor." (DSOF ¶¶ 31, 32.) His fast continued the following day, and he saw another social worker and also Nurse Makula, who noted that Haskins reported that he would begin eating again soon. (DSOF ¶ 33.) Haskins met with social workers at his request three more times regarding his criminal charges and ultimate conviction near the end of August 2012. (DSOF ¶¶ 35–37.)

On February 1, 2012, and on a form dated "multiple dates" (with a response from a jail official on February 21), Haskins submitted grievances regarding the medical care he received regarding the incident while at the jail. (DSOF ¶ 54.) A grievance officer responded to each grievance, advising Haskins to contact medical personnel or indicating that Haskins's grievance would be forwarded to medical staff. (DSOF ¶ 54.) Without setting forth the grievance procedure in detail, defendants assert that Haskins "has not produced any copy of the required appeal to the

Commissioner of Corrections" as to either medical grievance Haskins submitted to jail officials. (DSOF ¶ 54.)

On November 16, 2013, Haskins submitted this lawsuit against Nurses Sanchez, Peach, Sumulong, and Makula, alleging that they "obliterated" his "right to competent care." (Dkt. 1, pg. 6.) He alleged that they should have: (1) shaved a portion of his head to stitch the laceration closed; (2) identified a concussion and warned him of the dangers it might present; and (3) provided him with pain medication after his first visit with them. (*Id*. at 5–6.) Haskins currently experiences migraines and headaches, which he appears to attribute to the attack, but no doctor has linked those symptoms to the events of January 24, 2012. (DSOF ¶¶ 46, 47.) Haskins was released from incarceration by June of 2015. (Dkt. 66.)

Defendants have moved for summary judgment in their favor and against Haskins. (Dkt. 59.) For a time, briefing was suspended as the parties pursued additional discovery and then discussed settlement options. (*See, e.g.*, Dkt. 68, 70, 71, 73, 75, 84, 87, 91.) Defendants' motion is now fully briefed.

Defendants argue that summary judgment in their favor is appropriate, first, because Haskins failed to exhaust administrative remedies regarding his claim that they were deliberately indifferent to his medical needs, and, second, because the record does not establish that they were deliberately indifferent to Haskins's serious medical needs.

## IV. Exhaustion of Available Administrative Remedies

The Prison Litigation Reform Act requires prisoner plaintiffs to exhaust available administrative remedies before filing suit. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 87, 90 (2006) (citing *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). According to defendants, when Haskins responded to their discovery request for materials related to his pursuit of administrative remedies, he provided several grievances and responses from jail officials but did not provide any documentation showing that he pursued a required appeal after receiving a grievance response. (Dkt. 60, pg. 4; DSOF ¶ 54.)

Failure to exhaust, however, is an affirmative defense that defendants must plead and prove. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). Accordingly, Haskins need not prove that he did exhaust; defendants must prove that he did not. Defendants have not met their burden. The defendants' statement of facts does not contain a description of the grievance procedures.[2] Similarly, they provide no evidence in their Statement of Facts as to the availability of the grievance procedures to Haskins or regarding what the jail's records show as to Haskins's completion of the grievance process. Without more, the Court has insufficient evidence to conclude

---

[2] Defendants did, however, cite to a case, *Terrell v. Carter*, No. 13 C 1103, 2014 WL 6566072, at *1 (N.D. Ill. Nov. 20, 2014), in which the parties submitted evidence as to the Kane County Jail's grievance procedures at or near the relevant time. (Dkt. 60, at 4.) The discussion of the facts relating to available administrative remedies in that case does not demonstrate the relevant procedures in this case. Nor does it comply with Local Rule 56.1, or fairly permit a meaningful response by the pro se Plaintiff.

(given that the facts and reasonable inferences are drawn in the light most favorable to Haskins) that Haskins did not exhaust those procedures as required.

## V.    Deliberate Indifference to Serious Medical Needs

The Court allowed Haskins to proceed on a claim that the defendant nurses were deliberately indifferent to a serious medical need. The "same legal standards" govern "deliberate indifference claims brought under either the Eighth or Fourteenth Amendment" by prisoners or pretrial detainees, respectively. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). "A prison official may be found in violation of an inmate's Eighth Amendment right to be free from cruel and unusual punishment if she acts (or fails to act) with 'deliberate indifference to [the inmate's] serious medical needs.'" *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc). Deliberate indifference claims contain both an objective and a subjective component: the inmate must have an objectively serious medical condition and the defendant must be subjectively aware of and consciously disregard the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Nurses, like physicians, may [] be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citation omitted).

Defendants contend that they are entitled to summary judgment because Haskins did not have a serious medical condition. Moreover, they argue that they were not deliberately indifferent to Haskins's injuries.

## A. Objective Element—Serious Medical Condition

"A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)). A condition also may be objectively serious if a "failure to treat it could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes*, 546 F.3d at 522 (quotation marks and citation omitted). Where an inmate relies upon a delay in treatment to show an objectively serious medical condition, he must show that the claimed delay had a detrimental effect on or worsened his condition. *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *see also Reece v. Groose*, 60 F.3d 487, 491–92 (7th Cir. 1995) (stating in *dictum* that such evidence "goes to the objective component of the alleged medical-needs violation of the Eighth Amendment").

Defendants acknowledge that, through his testimony, Haskins appears to suggest that he had three arguably serious medical needs—a scalp laceration that he says required stitches, pain from the bruising to his chest, and a concussion he says Dr. Sood identified on the third day after the incident. As to the first two conditions, cuts and bruises generally are not deemed to constitute serious medical needs.

13

*Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006) ("[W]e note this court has held that injuries, such as those alleged by Pinkston—a split lip and a swollen cheek—do not rise to the level of an objectively serious medical need."); *Davis v. Jones*, 936 F.2d 971, 972–73 (7th Cir. 1991) ("No reasonable person would believe that a one-inch cut presents such a risk [of needless pain or lingering disability] unless the injured person is a hemophiliac."). Haskins suggested that his cut may have been longer than an inch (up to an inch and a half) or warranted more aggressive treatment because one nurse opined that he needed stitches. The medical records do not support a finding that his cut was more serious than Nurse Sanchez described in her written notes (even if it was longer) or necessitated stitches to properly heal. The record reflects that "[t]he chief criterion for ordering stitches is that the laceration was so deep or the bleeding so severe[] that the wound would not close and heal on its own, absent stitches." (DSOF ¶ 39.) Here, it is undisputed that the cut had scabbed over by the time Haskins saw Dr. Sood a few days later, (DSOF Ex. H, at 11), and the wound itself appears to have required no further medical intervention.

A concussion may constitute a serious medical need. *See Harmon v. Jordan*, No. 12-cv-0021-MJR-SCW, 2014 WL 4472693, at *6 (S.D. Ill. Sept. 11, 2014) (noting that in that case, defendants "do not dispute that a concussion or head injury is a serious medical need"). Again, however, the medical records do not support a conclusion that Haskins had a concussion as a result of the attack. Haskins, in fact, identified only a statement by Dr. Sood to establish that he had a concussion at all. (DSOF ¶ 50.) As

Haskins would use Dr. Sood's out-of-court statement to establish its truth—i.e., that he had a concussion—it is inadmissible hearsay. Moreover, the defendant nurses emphasize that Haskins's objective condition was inconsistent with a concussion. (DSOF ¶¶ 11, 49.)

Even if Haskins had a concussion, no medical evidence supports a conclusion that the purported condition worsened because of a failure by the *nurses*; while Dr. Sood allegedly identified the concussion and refused to treat it, there is no evidence that such treatment was warranted. Haskins links his more recent headaches to the inmate attack, but no doctor or medical evidence identified in the record has drawn that conclusion; more importantly, the established summary judgment record is devoid of any evidence that any treating physician has linked the *nurses'* purported failure to promptly diagnose or treat a concussion to Haskins's current symptoms. Without more, Plaintiff has not shown that he had a serious head injury requiring treatment.

Haskins reported that he suffered pain from the bruising to his chest. Pain may establish a serious medical condition, such that delayed treatment may violate the Constitution. *See, e.g., Smith v. Knox County Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012) (agreeing that "deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim") (citations omitted); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (noting that "the existence of chronic and substantial pain" is one method of establishing serious medical need) (citation omitted); *but see Boyce v. McKnight*, No. 14 C 0418, 2015 WL 8778330, at *11 (N.D. Ill.

Dec. 15, 2015) (emphasizing that appellate court has not held "that merely complaining about pain proves an objectively serious medical condition in all circumstances").

## B. Subjective Element—Deliberate Indifference

Defendants were not deliberately indifferent to Haskins's needs. Deliberate indifference is comparable to criminal recklessness. *Farmer*, 511 U.S. at 837. The official accordingly must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* "The requirement of subjective awareness stems from the Eighth Amendment's prohibition of cruel and unusual punishment; 'an inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain."'" *Zaya v. Sood*, 836 F.3d 800, 804–05 (7th Cir. 2016) (quoting *Estelle*, 429 U.S. at 105).

Claims of negligence (even gross negligence), medical malpractice, or a patient's disagreement with a prescribed course of treatment are insufficient to meet this standard. *See, e.g., Cesal v. Moats*, — F.3d —, 2017 WL 1046113, at *7 (7th Cir. Mar. 20, 2017). "[D]etainees are not entitled to receive 'unqualified access to healthcare.'" *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

Here, there is no indication that the defendant nurses knew or even suspected that Haskins might have had a concussion. The fact that the nurses never diagnosed

him with a concussion does not demonstrate their deliberate indifference to his medical needs because "[d]eliberate indifference requires more than evidence of negligence or medical malpractice." *Cesal*, 2017 WL 1046113, at *7 (citations omitted). The record does not permit a finding that the nurses were deliberately indifferent in failing to diagnose any concussion—the nurses examined and treated Haskins and there is no evidence that they missed or turned a blind eye to Haskins's complaints about his head.

Next, nothing suggests that the nurses' treatment of the cut—which as far as the summary judgment record reflects, led to no complications—departed from accepted nursing judgment, practice, or standards, and the nurses' multi-faceted treatment of the wound demonstrated their diligence. Within minutes, the nurses responded to correctional officers' request for treatment of Haskins. (DSOF ¶ 12.) Promptly upon their arrival at Haskins's cell, the nurses treated his bleeding laceration. (DSOF ¶ 13.) They thoroughly cleaned the wound, and addressed the potential threat to Haskins's health that they identified from that wound—a risk of infection—by applying an antibiotic and administering a tetanus shot, and scheduling Haskins for a follow-up appointment with the doctor. (DSOF ¶¶ 12, 15, 17, 18, 39, 43.)

Haskins testified that one nurse said that stitches would have been an appropriate alternate treatment for the cut, but another protested against cutting his hair. Even if the nurses' alleged statements were admissible (it is not clear which party opponent made the statements), a jury could not on this record infer that the

provided treatment "was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment,'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (citing *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)); *see also Cesal*, 2017 WL 1046113, at *7 (noting that merely "register[ing] disagreement with [doctor's] medical judgment" does not prove deliberate indifference), even if some nurses would have treated Haskins's injury differently. *Burton*, 805 F.3d at 786 (explaining that even "evidence that another [medical professional] would have followed a different course of treatment is insufficient to sustain a deliberate indifference claim"); *Jordan v. Milwaukee County*, — Fed. Appx. —, 2017 WL 778365, at *3 (7th Cir. Feb. 27, 2017) ("But Jordan must do more than show that he was not given the very best treatment; he must show that [nurse practitioner]'s course of treatment was 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.") (quoting *Petties*, 836 F.3d at 729). Haskins pointed to no ill effects from not receiving stitches. His cut did not become infected and healed without further incident, and the doctor, when expeditiously consulted after the initial treatment, added only an additional antibiotic to the regimen the nurses began. (DSOF ¶¶ 14, 18.)

This treatment plan, Haskins testified, left him, for the few days between seeing the nurses and his doctor's appointment, in pain from the contusions to his side caused by the fall to the ground after the attack. (DSOF ¶ 16.) The nurses, however, did not

diagnose Haskins with injuries to his side, which were days later diagnosed by Dr. Sood as a contusion (i.e., "an injury to tissue usually without laceration: bruise," Merriam-Webster Medical Dictionary, available at https://www.merriam-webster.com/dictionary/contusion#medicalDictionary (visited Mar. 29, 2017)). Dr. Sood prescribed only Naprosyn (a nonsteroidal anti-inflammatory drug similar to those available over the counter in smaller doses) to address Haskins's complaints of pain after that visit. (DSOF ¶ 18.) And, tellingly, the medical records do not reflect that Haskins made any requests for additional treatment or pain management in the interim between the treatment the nurses rendered and the appointment with Dr. Sood a few days later, although he generally made regular use of the jail's medical request kiosk to seek medical intervention or counseling.

Given that Haskins was bleeding from an open and obvious cut to the head, any failure to recognize and treat a latent secondary injury to his side (albeit uncomfortable for Haskins) could not be deemed to be deliberate indifference on the part of the nurses, even taking into account his complaint regarding his discomfort. *See Caffey v. Maue*, — Fed. Appx. —, 2017 WL 659349, at *3 (7th Cir. Feb. 15, 2017) (holding that, where plaintiff had been struck on head and requested medical attention from guard but "did not tell [officer] about the exact nature or extent of his [] injury," which was "not visually apparent," ignoring his request for doctor did not constitute deliberate indifference).

Here, four nurses rendered what appears to have been proper care to address Haskins's obvious external injury.[3] It is unfortunate that Haskins remained in pain from an additional injury he had tried to alert the nurses to, but, under these circumstances, with the comprehensive and attentive treatment provided for his bleeding head wound, that alone does not demonstrate that the nurses had a sufficiently culpable mental state to demonstrate deliberate indifference—as opposed to negligence. *See Harper v. Santos*, 847 F.3d 923, 928 (7th Cir. 2017) (holding that plaintiff had not demonstrated that nurse's "efforts were 'blatantly inappropriate,' or that she 'reckless disregarded his needs,'" even if she laughed at him and failed to transfer him immediately to hospital for treatment, as he believed should have been done); *Jordan*, — Fed. Appx. —, 2017 WL 778365, at *3 (holding that plaintiff had not

_____

[3] Haskins does not seem to challenge that the nurses, at most, could have provided him with a single ibuprofen dose. (DSOF ¶ 43.)

shown that nurse practitioner was deliberately indifferent to his medical needs by not prescribing asthma inhaler and his chosen pain medication, even though doctor subsequently prescribed those medications).

Haskins does not claim that the nurses were responsible for failing to manage any pain he experienced after he began to see Dr. Sood following his injury. Even if Haskins were making such a claim, however, a jury could not pin any such ongoing pain on the nurses. The doctor had prescribed a seven-day course of pain medication that the nurses were unable to prescribe; when notified of Haskins's complaint of renewed pain after that prescription expired, on February 10, 2012, Nurse Peach, promptly referred Haskins to the jail doctor, who renewed the prescription and set a further follow-up appointment. (DSOF ¶¶ 22, 25, 27, 43.)

On the undisputed evidence presented here, no reasonable jury could find that defendants were deliberately indifferent to Haskins's serious medical needs.

## VI.     Conclusion

Plaintiff's motion for summary judgment [92] is denied. Defendants' motion for summary judgment [59] is granted. The Clerk is directed to enter final judgment in favor of defendants.[4]

ENTER:

Manish S. Shah
United States District Judge

Date:    3/30/17

---

[4] If Haskins wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Haskins seeks leave to proceed in forma pauperis on appeal, he must file a motion for leave to proceed in forma pauperis in this Court. *See* Fed. R. App. P. 24(a)(1). Haskins can file an appeal without bringing a motion to reconsider this Court's ruling. But if he wishes this Court to reconsider its judgment, Plaintiff may file a motion under Federal Rules of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. Fed. R. Civ. P. 59(e). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. Fed. R. Civ. P. 60(c)(1). The time to file a Rule 59(e) or Rule 60(b) motion cannot be extended. Fed. R. Civ. P. 6(b)(2). A Rule 59(e) or Rule 60(b) motion suspends the deadline for filing an appeal until the ruling on the motion, but only if the motion is filed within 28 days of the entry of judgment. Fed. R. App. P. 4(a)(4)(A)(iv) and (vi).